IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GUY PETERSON, Individually and in his capacity as Trustee of the Guy A. Peterson, MDSC Money Purchase Plan, and DENA PETERSON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 02 C 7375 |
| v. | ) ) ) | The Honorable William J. Hibbler |
| JEFFREY L. GOLDBERG, JAMES HARTWELL, ARTHUR FREEDMAN, FINANCIAL CONSULTING GROUP, Inc., FERS PERSONAL FINANCIAL SERVICES, LLC, and ESSEX, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In April 2003, Jeffrey Goldberg pleaded guilty to various securities law violations and was
sentenced to 57 months in prison in connection with a scheme to induce clients, including the
Plaintiffs, into investing into a variety of private investment vehicles in which he was personally
associated either as an officer, advisor or fundraiser. Not surprisingly, the Petersons have brought
suit against Goldberg, his supervisors, and the companies for which Goldberg worked. FERS
Personal Financial Services, LLC, (FPFS) and Essex, LLC, Arthur Freedman, and James Hartwell
(collectively, the Essex Defendants) move for summary judgment.[1]

---

[1] The Petersons have also filed a motion to strike, alleging that the Essex Defendants have
improperly relied on two documents, one because it is privileged and a second (technically a
series of documents) because it was not disclosed in discovery. The Court need not resolve these
issues here, and the motion to strike is denied without prejudice. Plaintiffs are thus free to raise
the issues in motions in limine before trial.

1

## I. Factual Background

### A. The Petersons' Relationship with Goldberg

The Petersons became clients of Goldberg in March 1991, when Goldberg was associated with Financial Consulting Group, Ltd.[2] (Goldberg Jan. 23 Dep. at 8-9, Am. Compl. at ¶ 5). Around that time, the Petersons signed an engagement letter with FCG, whereby FCG agreed to provide comprehensive financial planning services to them. (FPFS 56.1(a)(3) Statement Ex. A). In June 1991, Goldberg developed an investment plan for the Petersons that called for a "moderate" degree of risk. (FPFS 56.1(a)(3) Statement Ex. B). Throughout the relationship, Goldberg would recommend investments to the Petersons, (Peterson Dep. at 122-24), and the Petersons paid FCG $26,500 for services rendered by Goldberg and other FCG employees. (Pl. 56.1(b)(3)(A) Statement (Essex) ¶ 9). Goldberg advised the Petersons to invest in three highly risky, speculative investments: Dauphin, Stamford, and HCC Funding/FuturesNow.com. (Pl. 56.1(b)(3)(A) Statement (FPFS) ¶ 13). Goldberg, however, did not disclose that he had financial interests in these investments. (Pl.

---

[2] The Essex Defendants assert that Goldberg owned and operated Financial Consulting Group, Ltd., a fact which the Petersons do not contest. The Essex Defendants point to Goldberg's deposition at pages eight-nine and the Plaintiffs' Amended Complaint at Paragraph Five to support this assertion. But the cited material makes no reference to Goldberg's alleged ownership of Financial Consulting Group, Ltd. (FCG). Similarly, in Plaintiffs' 56.1(b)(3)(B) Statement, they assert that Goldberg was a principal, director and shareholder of FCG from 1983 to 1997, citing only to the Essex Operating Agreement. But Plaintiffs fail to direct the Court to a specific portion of this agreement (in violation of L.R. 56.1) and the agreement appears to make no mention of FCG. Whether Goldberg was the owner or director of FCG, in itself, is not material, but the parties' failures to identify, with precision, the portion of the record relied upon, is evidence of the sloppy manner in which all parties presented their 56.1 Statements of Fact.

56.1(b)(3)(B) Statement ¶¶ 30-37).[3] The loss that resulted from these three investments serves as the basis of Plaintiffs' Complaint.

B.    The Formation of FPFS and Essex

From 1990 to 1997, Hartwell worked with Goldberg at FCG as a registered investment advisor. (Hartwell Dep. at 18). During that same period, Hartwell owned and operated Essex Financial, Limited, a company that provided financial advice. (Hartwell Dep. at 9, 16, 20). In 1997, Goldberg and Hartwell met with an accounting firm, Friedman, Eisenstein, Raemer, and Schwartz, L.L.P. (FERS, LLP) in order to form a limited liability corporation to provide financial planning advice to clients, including those of Goldberg and Hartwell.

As a result, in April 1997, Goldberg, Hartwell, and the FERS partners formed Essex, L.L.C. to operate as a money management company. (Pl. 56.1(b)(3)(B) Statement Ex. 11; Def. FPFS 56.1(a)(3) Statement Ex. C). Goldberg and Hartwell each contributed $100,000 in capital toward the formation of Essex. (Id.). FERS, LLP contributed $200,000 in capital toward the formation of Essex. (Def. FPFS 56.1(a)(3) Statement Ex. C). As a result, Essex's members were Goldberg

---

[3] Both FPFS and the Essex Defendants dispute several of Plaintiffs asserted facts, on the grounds that Plaintiffs cite only to their Complaint. The Defendants confuse the Plaintiffs' Complaint with the Civil Complaint filed by the SEC, another example of the sloppiness of the 56.1 materials. *See* Pl. 56.1(b)(3)(B) Statement Ex. 4). Plaintiffs also include in Exhibit Four the Order of Permanent Injunction in which Goldberg *admits* the allegations contained in the SEC's Complaint. Id. The Defendants point to no evidence to dispute Plaintiffs 56.1(b)(3)(B) Statement ¶¶ 30-32 and those facts are deemed admitted.

In addition, some disputes raised by the Defendants are not well taken. For example, in Paragraph 34, Plaintiffs assert, among other things, that Hartwell received shares of Dauphin in compensation for his employment at FCG, citing to Goldberg's Deposition at pages 114-15 and Hartwell's Deposition at pages 117-120. Defendants claim that the cited material does not support the fact. Contrary to Defendants' claim, however, Plaintiffs' proffered statement of fact is ripped directly from Hartwell's deposition testimony, in which he stated that he did not purchase shares of Dauphin, but "received them as compensation for being an employee of Financial Consulting Group." (Hartwell Dep. at 117).

(25%), Hartwell (25%) and the FERS partners (50% collectively). (Id.). The FERS partners were given the right to name two managers (or one manager with two votes), and Goldberg and Hartwell each were given the right to appoint one manager. (Pl. 56.1(b)(3)(B) Statement Ex. 11, ¶ 4.6). Goldberg, Hartwell, and Irwin Friedman (a named partner of FERS) were named as managers in Essex's operating agreement. (Id.). In addition, Hartwell served as President of Essex. (Def. FPFS 56.1(a)(3) Statement Ex. C).

At the same time, the FERS partners also created FERS Personal Financial Services, L.L.C. (FPFS), a financial planning company. (Id.). FPFS, was to refer its accounting clients to Essex, and Essex would then be responsible for rendering money management services in the form of investment advice to those clients and in turn pay FPFS a referral fee. (Hartwell Dep. at 17-18; Def. FPFS 56.1(a)(3) Statement Ex. C).

Pursuant to the Essex Operating Agreement, financial planning clients of Goldberg's or FCG's, such as the Petersons, became financial planning clients of FPFS. (Pl. 56.1(b)(3)(B) Statement Exs. 16, 28, 33).[4] In October 1997, Goldberg sent the Petersons a letter, using FPFS

---

[4] Both FPFS and Essex dispute this fact raised by Plaintiffs in Paragraph 11 of their 56.1 Statement, but neither points to evidence in the record to refute the Plaintiffs' assertion, and there is a veritable mountain of evidence in the record to support Plaintiffs' assertion (although not all of it cited to by the Plaintiffs— yet another example of the sloppy work by all sides in this matter). Plaintiffs' Exhibit 33, a memorandum of understanding signed by Goldberg, Hartwell, and FPFS (among others) states in paragraph three that the business of FCG and Essex Financial, Ltd. will continue to operate until "all of the clients are converted to the new companies." Plaintiffs' Exhibit 16, a letter written to the Petersons by Goldberg on FPFS letterhead, informs the Petersons that their invoices will come from FPFS and that all balances from prior invoices will carry forward and be due to FPFS. Plaintiffs' Exhibit 17 is a series of invoices sent to Plaintiffs by FPFS. Plaintiffs' Exhibit 6 is a memo written by Arthur Freedman on FERS letterhead documenting the formation of FPFS and Essex and it notes in Paragraph 15 that "all of Jeff's clients are clients of FERS Personal Financial Services, LLC [FPFS] and if Jeff leaves employment with Essex, LLC, he cannot take those clients." Finally, Plaintiffs' Exhibit 28, a Noncompetition and Nonsolicitation Agreement between FPFS, Inc. (a Delaware corporation),

4

letterhead, that informed them that their invoices would come from FPFS. (Pl 56.1(b)(3)(B) Statement Ex. 16).

In 2000, FPFS and Essex separated and certain FPFS clients, including the Petersons, became "purchased clients" of Essex. (Pl. 56.1(b)(3)(B) Statement Ex. 28; Goldberg Dep. at 205-06).

C. FPFS' and Essex's Knowledge of Goldberg's Activities

---

FPFS, Essex, Goldberg, and Freedman, defines "Purchased Clients" as "those certain client accounts of Old FPFS that were or will be purchased by Essex" and includes Guy Peterson as a "Purchased Client." The Court is hard pressed to envision a reasonable factfinder who would not conclude that the Petersons were clients of FPFS.

Later in Plaintiffs' 56.1(b)(3)(B) Statement they again raise the issue of whether the Petersons' were clients of FPFS and Essex and *again* the Defendants deny the allegations and *again* the Defendants fail to provide *any* documentary evidence to support their denial. (See Pl. 56.1(b)(3)(B) Statement ¶¶ 41-42; Defendants' Answers to Pl. 56.1(b)(3)(B) Statement ¶¶ 41-42). In fact, in Paragraph 42, Plaintiffs assert that the Petersons became "Purchased Clients" of Essex in 2000 and quote directly from the Noncompetition and Nonsolicitation Agreement. Incredibly, both Essex and FPFS dispute this fact, without providing even so much as a reason for that dispute, let alone any evidentiary support. But the Noncompetition Agreement is not the only documentary evidence that supports the Petersons' assertion. Plaintiffs' Exhibit 34 is a letter to Peterson from James Hartwell (Essex's President and CEO) informing the Petersons that Goldberg no longer is with the firm and that their account had been assigned to Mark Jacobs, of their firm. Because neither FPFS nor the Essex Defendants points the court to evidence to refute the Plaintiffs' assertions, the Court deems Plaintiffs 56.1(b)(3)(B) Statement ¶¶ 11, 41-42 to have been admitted.

A final note is in order here. Given that neither FPFS nor Essex has pointed the Court to any evidence whatsoever (in yet another example of the sloppy manner in which the 56.1 documents were prepared and submitted to the court) and given the veritable mountain of documentary evidence that exists in the record to support the allegation that the Petersons were in fact clients of FPFS, the Defendants denials arguably run afoul of, even flagrantly ignore, the requirements of Rule 11.

Defendants are cautioned to invest more time, thought, and attention to their 56.1 materials in the future and ensure that their denials are both well-taken and have evidentiary support in the record, and also that they take the time to direct the Court to the specific portions in the record where the evidentiary support for their denials rests. Should Defendants, or more precisely Defendants' counsel, show this extreme lack of diligence in the future they may well find themselves the recipients of sanctions under Rule 11.

5

Before the formation of FPFS and Essex, Arthur Freedman notified Goldberg that FERS expected him to "unwind [his] involvement in the various special projects indicated in your summary schedule dated December 11, 1996," a list that included Dauphin Technology, Inc. and H.C.C. (Pl. 56.1(b)(3)(B) Statement Ex. 5). Furthermore, Freedman informed Goldberg that he needed "to complete any money rasing activities that are currently underway and agree not to be involved in any future raising of funds without permission from FERS management. (Pl. 56.1(b)(3)(B) Statement Ex. 5). Freedman described these "various activities" as "outside of our [FERS'] comfort level." (Id.).

When the new companies formed, they reaffirmed Freeman's instructions to Goldberg, recognizing that he had "been involved in certain business operations over the years which represent some activities not to be engaged in in the future by either [FPFS] nor [sic] Essex, LLC. These include operating as a general partner, administrator, or money raiser for various activities. As part of this agreement, [Goldberg] will supply a list of all continuing activities and the entities to which they apply . . . and report to Essex LLC his amount of time spent on prohibitive activities." (FPFS 56.1(a)(3) Statement Ex. C ¶ 11). This understanding was also recognized in Goldberg's employment contract, where Essex included a similar clause discussing Goldberg's "Outside Activities." (FPFS 56.1(a)(3) Statement Ex. D. ¶ 4). And in a memorandum of understanding, Goldberg agreed to "terminate all relationships and otherwise end his continuing involvement in the aforementioned business operations by December 31, 1997." (Pl. 56.1(b)(3)(B) Statement Ex. 33 ¶ 7).

But despite Goldberg's agreement to terminate his special activities, he did not. Further, Hartwell, acting as Essex's president, took no steps to ensure that Goldberg complied with his

obligations. (Hartwell Dep. at 129). In fact, by September 1998, Essex and FPFS were both made aware by the SEC that Goldberg continued the aforementioned outside activities. The SEC informed FPFS and Essex that Goldberg maintained a client trust account for the purpose of holding in escrow funds of advisory clients and other investors who invest in private placement opportunities, many of which Goldberg had a personal financial interest or other direct involvement. (Pl. 56.1(b)(3)(B) Statement Exs. 8-9). The SEC requested that FPFS and Essex engage an accountant to examine the account because, among other things, Goldberg had made at least four overdrafts in a 5-month period earlier in the year. (Id.). The SEC informed FPFS and Essex that because it had actual custody of the client funds, they were required to comply with Rule 206(4)-2 of the Advisors Act. (Id.). And despite learning that Goldberg had not, in fact, terminated his relationships in the "outside activities" by September 1998 (nine months past the agreed upon date), FPFS actually *decreased* the amount of time it spent monitoring Goldberg's activities. (Freedman Dep. at 184-85).

The Petersons were never informed by Goldberg, FPFS, or Essex, about the SEC's concerns. (Pl. 56.1(b)(3)(B) Statement ¶ 20, Ex. 1 ¶¶ 8-9). Further, neither Goldberg nor FPFS nor Essex ever sent the Petersons any of the items that the SEC had required FPFS and Essex to send. (Pl. 56.1(b)(3)(B) Statement ¶ 23; Def. FPFS Answer to Pl. 56.1(b)(3)(B) Statement ¶ 23; Def. Essex Answer to Pl. 56.1(b)(3)(B) Statement ¶ 23; Pl 56.1(b)(3)(B) Statement Exs. 8-9). Nor were the Petersons ever informed by Goldberg, FPFS, or Essex, that the private placements he recommended to them were not authorized by FPFS or Essex. (Pl. 56.1(b)(3)(B) Statement Ex. 1 ¶ 8).

D.    Dauphin

In 1995, Goldberg recommended to the Petersons that they invest in a company called Dauphin Technology, Inc. (Peterson Dep. at 163-164). Dauphin produced electronics and computer-

related products and its stock was traded on an electronic Over-the-Counter Bulletin Board. In 1995, the Petersons purchased 101,600 shares of Dauphin stock at .3636 per share ($36,945.45). (Def. FPFS 56.1(a)(3) Statement Ex. N). In 1998 and 1999, the Petersons purchased 206,400 shares of Dauphin at a total cost of $170,091.60. (Id.) The 1998 and 1999 purchases occurred after the Petersons noted that Dauphin was trading at $.50 per share and inquired whether that indicated that the company was in trouble. According to Peterson, Goldberg informed them that Dauphin's "price was depressed because one of the previous financiers of Dauphin's debt had had an agreement whereby they could sell a couple million dollars' worth of stock having bought it at 30 percent below the market . . ." and that Dauphin was still a very good buy. (Peterson Dep. at 173-74).

In September 1999, however, the value of Dauphin's stock had not changed significantly, and the Petersons asked Goldberg whether the company's prospects were still as good as he previously thought. (Id. at 175-76). Goldberg informed the Petersons that Dauphin was not "making any big progress in their underlying business and that it was probably not, in his opinion, as good a buy as it had been previously." (Id. at 176). The Petersons sold 83,000 shares in September 1999 and 105,000 shares in October 1999. (Def. FPFS. 56.1(a)(3) Statement Ex. N). By December 1999, Dauphin's price had started to fall, and the Petersons asked Goldberg whether he knew why. Goldberg told them that he was uncertain about why the stock was falling, that he had tried to talk to people at the company, and that "it couldn't be good news." (Peterson Dep. at 176). The Petersons then asked whether he should sell the rest of his stock, and Goldberg answered in the affirmative, adding "if it made sense to have a tax loss for the year . . ." to offset capital gains. (Id.). The Petersons then sold the remainder of their shares. (Def. FPFS. 56.1(a)(3) Statement Ex. N).

But Goldberg's statements to the Petersons were nothing but a pack of lies. In fact, contrary to Goldberg's assertion that he couldn't get in touch with anyone at Dauphin, Goldberg was on the Board of Directors for Dauphin from 1998 to 2002. (Pl. 56.1(b)(3)(B) Statement Ex. 4).[5] Goldberg also owned shares of Dauphin — 400,000 shares. (Goldberg Dep. at 215). In February 2000, just a few scant months after the Petersons divested themselves of the Dauphin stock, Dauphin stock rose to approximately $12.00 a share. (Goldberg Dep. at 216). Just prior to the rise in value, Dauphin landed a $500 million contract with the government of Greece. (Peterson Dep. at 203-04). Goldberg admitted that he knew about the negotiations for that contract and knew that they had been ongoing for almost a year and that he was not surprised that Dauphin obtained the contract. (Goldberg Dep. at 217-219). Goldberg disclosed none of the information he possessed to the Petersons.

E.     Stamford & HCC

Shortly after learning about Dauphin's rise in value, Peterson contacted Goldberg to discuss his investments. (Peterson Dep. at 82-86). At that meeting, Goldberg recommended that Peterson

---

[5] Defendants also contest this fact, asserted by the Plaintiffs in Paragraph 32. The Defendants ground their denial of this fact in their mistaken belief that the Plaintiffs cited to their complaint and not to the SEC's Civil Complaint and the Order by Judge Pallmeyer issuing a Permanent Injunction. But even putting that mistake aside, there is much more evidence to support this fact. Goldberg himself testified that he was the Secretary of Dauphin. (Goldberg Dep. at 215). Defendants' knee-jerk instinct to deny any fact asserted by the Plaintiffs is evident as they claim, despite numerous sources of evidence, that the fact that Goldberg was a Director of Dauphin is in dispute, again without providing an ounce of evidentiary support for their claims. The purpose of Rule 56.1 Statements of Fact, which all parties here seem to have forgotten, is to assist the Court in identifying the material, uncontested facts in the record, and not to provide a playground for the parties' petty bickering or illusory disputes. By repeatedly failing to cite to the evidentiary support in the record and by repeatedly contesting facts that clearly are not in dispute, the parties ignore and flaunt the purpose of Rule 56.1. Each of the parties' 56.1 submissions has been sorely lacking and all parties should consider themselves fortunate not to have to respond to a Rule to Show Cause why they should not be sanctioned under Fed. R. Civ. P. 11. The Court trusts that none of the counsel at issue shall submit to the Court materials so grossly inadequate in the future.

invest in Stamford. (Peterson Dep. at 86). Peterson testified that Goldberg told him that he had performed some legal services for Stamford and in lieu of being paid money had been given an opportunity to buy Stamford stock at one-half of its lowest closing price prior to a purported merger with a company called Nanovation Technology. (Peterson Dep. at 86-87). Goldberg allegedly informed Peterson that after Stamford and Nanovation Technology merged the price of Stamford would rise 1500%, and that it was one of the best investments he had seen in a long time. (Peterson Dep. at 87-88). Goldberg then offered to allow Peterson to purchase one-half of his shares. (Peterson Dep. at 87). At the meeting, Goldberg also informed Peterson about a company he called FuturesNow.com, which was a psuedonym for HCC. (Peterson Dep. at 90). Goldberg explained that futuresNow.com was developing a technology whereby individual investors could trade in futures electronically and that the technology would make it a successful company. (Peterson Dep. at 90-91).

As a result of the February 26, 2000 meeting, Peterson wrote Goldberg several checks on February 28: 1) a $20,000 check to purchase 2,000 shares of Stamford; 2) a $63,750 check for the purchase of three units of futuresNow.com for Peterson's personal account; and 3) a $21,250 check for the purchase of one unit of futuresNow.com for Peterson's pension plan. (Def. Essex 56.1(a) Statement Exs. 10-13). Based on Goldberg's continuing recommendation, Peterson purchased additional shares of Stamford using his Ameritrade account from March 2000 until January 2002. (Def. Essex 56.1(a) Statement Exs. 19-23; Peterson Dep. at 241-242, 249).

Goldberg, however, did not disclose to the Peterson his involvement with HCC (a.k.a. futuresNow.com) and Stamford. From 1996 to 2002, Goldberg managed HCC. (Pl. 56.1(b)(3)(B) Statement Ex. 4, ¶ 8). And Goldberg served on Stamford's Board of Directors in 2000 and became

Stamford's CEO in 2001. (Pl. 56.1(b)(3)(B) Statement Ex. 4, ¶¶ 8, 16). In fact, much of Goldberg's "advice" to the Petersons were lies: Stamford's Board had rejected the merger described by Goldberg in July 2000, and yet Goldberg continued to advise the Petersons to purchase more stock in Stamford. (Pl. 56.1(b)(3)(B) Statement Ex. 4, ¶ 16).

F.     The SEC's Involvement

Eventually, Goldberg's deceit caught up with him. Customers began to complain to Essex and FPFS about Goldberg, and he was terminated in March 2002. Shortly thereafter, Essex revised its Compliance Manual. (Pl. 56.1(b)(3)(B) Statement Ex. 13, Goldberg's Dep. at 309-312). Goldberg was charged in a two-count criminal complaint filed on April 1, 2003, alleging that he engaged in widespread fraud against his clients by making false and fraudulent material misrepresentations and omissions about the risks involved in the investments, the expected return on the investments, the use of money raised from investors, and the investment experience of those offering the investments. (Def. Essex 56.1(a)(3) Statement Ex. 30, ¶ 3). The SEC filed a civil complaint against Goldberg the following day, alleging that Goldberg engaged in fraud, violated federal securities laws, and abused his position of trust to raise money from investors. (Pl. 56.1(b)(3)(B) Statement Ex. 4).

Several months after the SEC filed its complaint against Goldberg, it sent Essex a deficiency letter. (Pl. 56.1(b)(3)(B) Statement Ex. 15). The SEC noted that, although Essex "generally prohibited [employees] from recommending securities that do not appear on [Essex's] recommended list," Goldberg and one other Essex employee had been recommending private placements to advisory clients that were not on the recommended list. The SEC observed that Essex officials were not aware of the representations made about these investments by Goldberg and the other employee.

(Id.). The SEC further commented that Essex "did not have any procedures to verify that employees were only recommending securities that were on the recommended list or that all securities invested in by clients would appear on the custodial statements." (Id.).

The SEC went on to note that Essex "implemented a policy in 2002 that requires all employees to certify in writing that they have not solicited clients to invest in any private placement offerings." (Id.). But the SEC reasoned that given Goldberg's (and the other employee's) activities, it appeared that there were "considerable weaknesses in [Essex's] system for supervising advisory representatives and that certification alone is not adequate." (Id.). The SEC concluded that Essex had no procedure to verify that employees were only recommending securities on the recommended list and that as a result Essex's compliance program was "not sufficient to enable [Essex] to detect whether an employee fails to adhere to the policy or is engaged in fraud or violation of securities laws. (Id.).

The Petersons filed this suit on October 15, 2002.

## II.    Standard of Review

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts and inferences are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the party opposing summary judgment must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. And neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor

12

the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat such a motion. Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson*, 477 U.S. at 248. A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

### III. Analysis

#### A. Statutes of Limitations and Repose

Both FPFS and the Essex Defendants argue that summary judgment should be granted in their favor on any claims regarding the purchase of Dauphin stock because those claims are barred by both the statute of limitations and the statute of repose. The Illinois Securities Law provides for a three-year statute of limitations and a five-year statute of repose. 815 ILCS 5/13(D).

The Petersons filed suit October 15, 2002. Thus, any claims that rest on the sale of securities prior to October 15, 1997 are barred by the statute of repose. The Petersons purchased Dauphin stock in May, September, and December 1995 and any claims relating to sales of securities that rest entirely on the *purchase* of Dauphin stock in 1995 are barred by the statute of repose.

The Defendants, however, also suggest that claims relating to the purchase of Dauphin stock in 1998 and 1999 is barred by the statute of limitations, as the purchases occurred more than three years prior to the filing of this suit. The Defendants suggest, with little explanation or argument, that the Plaintiffs had actual knowledge that Dauphin was a high-risk stock by 1999, and therefore there is no reason to extend the statute of limitations. But whether the Petersons knew that Dauphin stock was a high-risk simply is irrelevant. The statute allows for the extension of the statute of limitations

13

"if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation of subsection E, F, G, H, I or J of Section 12." 815 ILCS 5/13(D). The Petersons' claim is not simply that Goldberg sold them high-risk stocks; it is that he *defrauded* them by making material misrepresentations about the investments he solicited. The knowledge that Dauphin was a high-risk stock sheds no light whatsoever on the point in time at which the Petersons knew or should have known that Goldberg was violating Section 12 of the ISL.

The Petersons also point out the any *sale* of a security may trigger a violation of the ISL. *See* 815 ILCS 5/13(D).[6] The Petersons argue that their claims related to Dauphin involve not only the purchase of the stock but also the sale of the stock, when Goldberg allegedly made material misrepresentations or omissions while advising them to sell the stock. The Petersons *sold* their Dauphin stock in 2000, well within the applicable statute of limitations.

The Petersons' claims related solely to the purchase of Dauphin stock in 1995 are barred by the statute of repose and summary judgment on those claims is granted in favor of FPFS and the Essex Defendants. The Petersons' claims related to the purchase of Dauphin stock in 1998 and 1999 are not barred by the statute of limitations. And to the extent that the Petersons' claims relate to their sale of Dauphin stock in 2000, those claims are also not barred by the statute of limitations.

B.      Goldberg's Authority

---

[6] The Defendants consistently misrepresent the statute, claiming that it "bars all claims based on the purchase of stock more than five years prior to the date that suit was filed." (Def. FPFS Memorandum in Support of Summary J. at 8).   But the running of the statute of limitations and repose is not triggered solely to the *purchase* by a security. It is triggered by any sale of securities. 815 ILCS 5/13(D).

FPFS and the Essex Defendants both argue that summary judgment should be granted in their favor because Goldberg did not have either actual or apparent authority to advise the Petersons to invest in Dauphin, Stamford, and HCC.

Actual authority can be granted only by the words or conduct of the principal, and not by those of the agent. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). The Essex Defendants argue that it had a Compliance Manual that prohibited Goldberg from engaging in activities such as insider authority, and therefore, when he gave investment advice to the Petersons, he was acting outside the scope of his authority. The problem with the Essex Defendants' argument, say the Petersons, is that Essex has produced only the 2002 Compliance Manual, and not the 1997 Manual that was in effect during the relevant time-period. It is true that Essex has not cited the 1997 Compliance Manual. Instead, Essex points to Hartwell's affidavit, in which he avers that the 1997 Manual prohibited activities that are at issue here, such as insider trading. (See Def. Essex 56.1(a)(1) Statement Ex. 1, ¶ 13). Hartwell's affidavit is supported by Goldberg's deposition testimony. Goldberg testified that Essex's policies against fraud (and also instructions regarding the possession and disclosure of nonpublic information) were in place during his time at Essex. (Goldberg Dep. at 274-275). Goldberg also signed an acknowledgment wherein he agreed to abide by Essex's restrictions on personal and insider trading. (Def. Essex 56.1(a)(1) Statement Ex. 14).

The Court finds that Essex did not give Goldberg express authority to recommend the Dauphin, Stamford, or HCC investments to the Petersons. First, Essex did not give Goldberg the authority to commit fraud. *See, e.g., Harrison v. Den Witter Reynolds, Inc.*, 974 F.2d 873, 883 (7th Cir. 1992). And second, Essex also insisted that Goldberg wind down his special projects (of which the Dauphin, Stamford, and HCC investments were part)— and made it clear that it would not

15

compensate Goldberg for any time he spent on those activities. The fact that Essex did little to ensure that Goldberg complied with its directives does not alter the fact that Essex not only failed to give Goldberg express authority to recommend any of his special projects to investors, but that it expressly prohibited him from doing so. The Court therefore concludes that there is no genuine issue of material fact as to whether Goldberg had actual authority to recommend Dauphin, Stamford, or HCC to the Petersons.

The Plaintiffs argue, however, that Goldberg had apparent authority to make such recommendations. Under the doctrine of apparent authority, a principal is bound not only by the authority that it actually gives to another, but also by the authority that it appears to give. *Gilbert v. Sycamore Mun. Hosp.*, 156 Ill.2d 511, 523, 622 N.E.2d 788, 795 (1993). Apparent authority is the authority a reasonably prudent person, exercising diligence and discretion, would assume the agent to possess. *Id.* In other words, if the transaction, from the point of view of a third person, seems regular on its face and the agent appears to be acting in the ordinary course of business confided to him, then the agent acted with apparent authority. *American Soc'y of Mech. Eng'rs. Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 102 S. Ct. 1932 (1982); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 875 (7th Cir. 1992). The question of whether a person has notice of or is aware of an agent's lack of authority is a question of fact, and therefore, not particularly suited for resolution on summary judgment. *Id.* This case is no exception.

Here FPFS and the Essex Defendants argue that the Petersons could not have reasonably believed that Goldberg was acting within the authority granted by them. FPFS points to a variety of facts that it argues should have alerted the Petersons to the fact that Goldberg was acting outside his authority: 1) the Petersons complained to Goldberg in January 1996 about a series of mishaps

regarding other investments; 2) Goldberg recommended Dauphin, which the Petersons learned to be a high-risk stock; 3) the Petersons' disappointment in Goldberg's recommendation to sell Dauphin just before its increase in value.[7] FPFS argues that these facts should have alerted the Petersons that Goldberg had acted negligently, and therefore that he was acting outside the scope of his authority.

FPFS' argument fails for several reasons. First, FPFS places far too much importance on the facts it cites to show that the Petersons could not reasonably have believed that Goldberg was acting with authority from FPFS. For example, FPFS makes much of the fact that the Petersons were "terribly disappointed" in Goldberg's advice to sell the Dauphin stock. FPFS quotes a portion of Peterson's deposition testimony where Peterson states that he was disappointed by the way the Dauphin investment turned out and that he believed that Goldberg's advice "did not serve him in the best manner." But simply because Peterson may have had reason to be disappointed in Goldberg's advice does not mean that he had reason to suspect that Goldberg had acted negligently, let alone that Goldberg was defrauding him. Indeed, a careful reading of Peterson's testimony shows that Peterson continued to believe Goldberg was acting in his best interests. Peterson stated that Goldberg told him "that he was very, very sorry . . .; that he was going to do everything in his power to help [him] find appropriate investments . . . [and that he] was able to convince me through his confident manner that he was telling the truth." (Peterson Dep. at 252).

---

[7] FPFS also makes passing mention of the fact that the Petersons failed to inform anyone at FPFS of the problems with Goldberg. (Def. FPFS Mem. in Supp. Summ. J. at 12). The Court fails to see how this is relevant to whether the Petersons believed that Goldberg was acting within the scope of his authority. To the contrary, it tends to suggest that they *did* believe that Goldberg was acting within the scope of his authority—had they believed he was not, they would have contacted FPFS, as they and other customers did later when Goldberg's schemes were finally uncovered.

Similarly, the simple fact that the Petersons began complaining to Goldberg about his advice as early as 1996 does not suggest that they suspected that Goldberg was defrauding them. Instead, the record shows that the Petersons' complaints were related to bookkeeping questions. In fact, an internal memorandum written by Art Freedman confirms that the client complaints regarding Goldberg were not that related to fraud, but Goldberg's supposed bookkeeping errors. (See Pl. 56.1(b)(3)(B) Statement Ex. 36). Finally, FPFS' argument that the Petersons were aware that Dauphin, Stamford, and HCC were high risk stocks is misleading at best. Even if this fact were undisputed, which the Court does not find, the Petersons' claim is not simply that Goldberg encouraged them to invest in high-risk stocks. It is that Goldberg defrauded them. The simple fact that Goldberg might have been recommending investments that were not well-suited to the Petersons investment plan does not give the Petersons any reason to believe that Goldberg was defrauding them. While a reasonable jury potentially could infer that Peterson had sufficient knowledge to alert him to the fact that Goldberg was misleading him or defrauding him, it is not the only reasonable inference that could be drawn and therefore summary judgment is not appropriate.

But there is a deeper problem with FPFS' argument and that is that FPFS ignores much of the evidence that supports an inference that Goldberg was acting with the approval of FPFS: 1) the Petersons received invoices from FPFS; 2) Goldberg communicated with them from FPFS offices; 3) Goldberg used FPFS letterhead to communicate with them; 4) Goldberg told the Petersons that FPFS had acquired FCG (his former company) and that he would be a principal of a new, larger firm; 5) in his capacity as Director of FPFS, Goldberg told the Petersons that future invoices and billing statements for his services would be generated by FPFS; 6) FPFS sent the Petersons promotional materials, including some that listed Goldberg as a member of the firm; and, perhaps most

importantly, 7) FPFS never informed the Petersons of the SEC's concerns with Goldberg's activities or that they did not condone Goldberg's special projects. A reasonable jury could infer from these facts that it was reasonable for the Petersons to believe that Goldberg had authority from FPFS to provide investment advice to the Petersons regarding Dauphin, Stamford, and HCC.

FPFS only casually addresses these facts, pointing out, for example, that it had ceased sending invoices to the Petersons in 2000, when the purchases of Stamford and HCC were made, and therefore after that time it was no longer reasonable for the Petersons to believe that Goldberg was acting with authority from FPFS. But FPFS never informed that they became "purchased clients" of Essex when Essex and FPFS split. FPFS never notified the Petersons that Goldberg no longer operated under its mantle. And the February 26, 2000 meeting, where Goldberg recommended the Stamford and HCC investments occurred in FPFS' office — that they were not later billed for his advice has no relevance to their reasonable belief at that time. A reasonable jury could infer from these facts that Goldberg continued to have apparent authority from FPFS to provide investment advice to the Petersons even after 2000.

The Essex Defendants make much the same argument as FPFS. There is, however, a critical difference between Essex and FPFS. While the undisputed facts demonstrate that the Petersons had ample knowledge of Goldberg's relationship with FPFS, the Petersons direct the Court to no facts that demonstrate they understood or were aware of Goldberg's relationship with Essex.

In fact, the Essex Defendants point out that the Petersons never furnished any funds to Essex, never paid Essex for any investment advice, and never received any trade confirmations or account statements from Essex. The Petersons argue that the SEC informed Essex that it had control of client funds related to Goldberg's projects. But the Petersons were not aware of this fact and it does

not serve to demonstrate that their belief that Goldberg acted with apparent authority from Essex was reasonable.

Nevertheless, the Petersons argue that they received invoices from Essex in May and June of 2000. The Petersons also received mailings from Essex listing Goldberg as a member and a principal in November 2000. And when the Petersons finally began to complain about Goldberg's activities, they complained to Essex. Thus, even though Goldberg informed the Petersons in 1997 that they would become clients of FPFS, they received several communications throughout 2000 that could have caused them to believe that Goldberg had a relationship with Essex and therefore that they too had a relationship with Essex. Not all of Goldberg's fraud was complete by May 2000, because the Petersons continued to make purchases of Stamford stock until 2002. When these facts are coupled with the fact that Essex sometimes provided services to customers without engagement letters and that the Petersons' account was transferred to another Essex employee when Goldberg was terminated, a reasonable fact finder could conclude that the Petersons assumed that they had a relationship with Essex as well as Goldberg beginning in May 2000.

C.    FPFS's & Essex's Proximate Cause Argument

FPFS makes a half-hearted argument that the Petersons cannot show that their injuries were proximately caused by Goldberg's advice. This argument merits little discussion. FPFS characterizes the Petersons injuries as arising solely from the fact that they invested in high risk investments upon Goldberg's recommendation. But the Petersons' claim is more than just that they were caused to invest in high risk investments—it is that Goldberg *deceived* them.

Essex's proximate cause argument reasons that the Petersons made their investments before Essex even existed or before they had any relationship with Essex. But as noted earlier, the

20

Petersons became "purchased clients" of Essex in April 2000, and their purchases of Stamford continued until January 2002. As early as 1997 Essex was in control of client funds, as noted by the SEC letter. Further, Goldberg had an employment contract with Essex beginning in 1997. Given these facts, the Essex Defendants' argument that its failure to supervise Goldberg could not have been the proximate cause of the Petersons injuries is without merit.

## D.    Sale of Dauphin Stock

FPFS also argues that summary judgment should be granted in its favor on all counts for claims related to the sale of Dauphin stock. FPFS first argues that Goldberg never advised Peterson to sell his stock, noting that, in the September 1999 and December 1999 conversations between Peterson and Goldberg, Goldberg never explicitly recommended to the Petersons that they sell the Dauphin stock.

It may be true that Goldberg never made an explicit recommendations, but FPFS ignores the entire context of the conversations between Peterson and Goldberg. In September 1999, the Peterson approached Goldberg because the stock had not performed the way Goldberg had led him to believe it would. A reasonable jury could infer that the Petersons approached Goldberg for advice on how to handle their Dauphin stock. And Goldberg misled them. Goldberg had previously led the Petersons to believe that the value of Dauphin stock would rise dramatically because it was emerging from bankruptcy and its price had been depressed. But nearly four years after the Petersons had initially invested in Dauphin, no turn-around in the stock's price had materialized. The Petersons inquired of Goldberg whether the company's prospects were still good, and Goldberg told them, falsely, that they were not. A reasonable jury could conclude that it was reasonable for the Petersons

to conclude that Goldberg's advice was a recommendation to rid themselves of their Dauphin investment.

But the December 1999 conversation is even more telling. The Petersons had sold only a portion of their Dauphin stock after the September 1999 conversation. By December 1999, however, the price of Dauphin had started to fall. Again they approached Goldberg for advice. And again, he misled them. This time, Goldberg told him that he had been unable to talk with anyone at the company (despite the fact that he was on the Board of Directors). FPFS makes much of the fact that the Petersons already knew that the price of Dauphin had fallen. But stock prices fluctuate frequently and not every fall in price constitutes a reason to sell. They asked Goldberg for advice and he told them it was "not good news," creating the implication that this particular drop in price might be cause to sell. When pressed for a recommendation about whether to sell the Dauphin stock, Goldberg answered in the affirmative, adding a qualifier — if it made sense to have a tax loss for the year. FPFS latches onto the qualifier as evidence that Goldberg did not recommend that the Petersons sell the stock. But the mere fact that Goldberg qualified his advice does not make his recommendation any less explicit.

Goldberg was an investment advisor. He occupied a position of trust. The Petersons came to him twice for advice related to Dauphin and twice Goldberg misled them. A reasonable jury could infer from these facts that Goldberg's actions caused the Petersons to sell their Dauphin stock.

FPFS next argues Goldberg's advice did not violate any professional standard. This argument borders on frivolous and merits little discussion. FPFS seizes on the Petersons' expert's deposition testimony. In her deposition, she testified that she would advise a new client who had an unsuitable investment in his portfolio to dispose of the investment. Thus, FPFS argues, Goldberg

did exactly what the Petersons' expert testified he should have done. But in making this argument, FPFS rips Goldberg's actions from their context and places them in an entirely irrelevant context. First, the Petersons were not *new* clients, and the advice one gives to new clients may differ from the advice one gives to established clients with a preexisting investment plan. But more importantly, FPFS ignores entirely the fact that the Petersons' claim is more about Goldberg's fraudulent advice than his recommendation of high-risk investments. It is simply nonsensical to suggest that Goldberg did not violate professional standards when he advised the Petersons regarding Dauphin and failed to disclose his status as a Dauphin insider, particularly when Goldberg owned shares of Dauphin and had the option to purchase more, and was privy to information related to the financial well-being and outlook for Daupin.

Finally, FPFS argues that the Petersons claims for damages related to both the purchase and sale of the Dauhpin stock are inconsistent. FPFS suggests that the Petersons' theories of liability are mutually exclusive and it would be inconsistent to hold FPFS liable for Goldberg's alleged recommendation to purchase high-risk stock and then later hold him liable for a recommendation to sell that high-risk stock. FPFS suggests that "common sense" dictates that if an investment is inappropriate, the proper remedy is to dispose of it. But that is not always so. Indeed, FPFS's own expert testified that part of disposing of an investment is to determine the most appropriate method of doing so. (Kolb Dep. at 128-129).

In its reply brief, FPFS employs a medical analogy to support its argument. FPFS posits that a plaintiff who claims a doctor was negligent for initially recommending a patient take a certain medication that is inappropriate could not later say the doctor was negligent if he told the patient to stop taking the medication. The analogy is clumsy at best, because it does not pose the right question

23

(what is the best remedy to treat a patient who has been given inappropriate medication). A more accurate analogy would ask whether a patient could press malpractice claims because the doctor gave him inappropriate medication and because the doctor did not take the appropriate remedy once discovering the error. The answer would be certainly, and a simple example will make it clear. A doctor fails to read a patient's chart and negligently administers penicillin. After discovering the error, the doctor does not investigate the seriousness of the allergy and immediately performs some invasive medical procedure when less intrusive treatment would have sufficed may have committed a second act of malpractice.

But the inappropriateness of FPFS's analogy becomes even more apparent when the element of fraud is incorporated into the example. A doctor knows a patient is allergic to penicillin but decides to administer it to the patient anyway to increase his medical fees. After administering the penicillin the doctor falsely informs the patient that the only way to save his life is to perform emergency surgery (thereby guaranteeing himself even more fees). Certainly a claim against the doctor for giving him the penicillin and a claim for performing the surgery are not mutually exclusive. And a jury could find that this is precisely what Goldberg did: 1) he falsely led the Petersons to invest in Dauphin by misrepresenting the value and risk of the investment because he stood to gain the more money that was invested in Dauphin; and 2) he later falsely informed the Petersons about Dauphins prospects to induce them to sell so that he would hold a higher percentage of Dauphin stock and his investment would therefore be worth more when the price of the stock rose. These two theories of liability are not mutually exclusive.

E.    Freedman's and Hartwell's Personal Liability

The Petersons also seek to hold Freedman and Hartwell personally liable for FPFS's and Essex's failure to properly supervise Goldberg. Under Illinois law, corporate officers may be personally liable for torts if they participated in the conduct giving rise to that liability. *ITOFCA Inc. v. Hellhake*, 8 F.3d 1202, 1204 (7th Cir. 1993); *Froehlich v. Matz*, 93 Ill. App. 3d 398, 417 N.E. 2d 183 (1981). The Petersons argue that this standard is met because there is evidence that Hartwell and Freedman knew of Goldberg's special projects and did nothing to stop them. But the simple fact that Hartwell and Freedman knew of Goldberg's special projects does not mean that they knew he was defrauding investors. There simply is no evidence that Hartwell and Freedman participated in Goldberg's fraud, and they are granted summary judgment on all claims against them personally.

F.    Petersons' Negligent Hiring and Retention Claim

The Essex Defendants also argue that they are entitled to summary judgment on the Petersons' negligent hiring and retention claims. Employers can be liable for hiring and retaining unfit employees where the employee commits intentional torts or engages in criminal conduct. *See Martin v. Yellow Cab Co.*, 567 N.E.2d 461, 466 (Ill. App. Ct. 1990). As a claim based on Essex's alleged negligence, the Petersons must establish, among other things, that Essex owed the Petersons a duty of care. *Puckett v. Mr. Lucky's Ltd.*, 529 N.E.2d 1169, 1172 (Ill. App. Ct. 1988).

When FPFS and Essex formed, Goldberg notified the Petersons that they had become clients of FPFS, not clients of Essex. The Petersons never sent Essex any money, nor received any invoices from Essex until after Goldberg had completed his fraud. The Petersons argue that the mere fact that Goldberg was an employee of Essex and that the Advisors Act prohibits investment advisors from defrauding prospective clients establishes that Essex owed them a duty. Following the Petersons'

25

logic, Essex would have a duty to *everyone* because anyone could become a prospective client of their employees.

But as noted earlier, the Petersons became "purchased clients" of Essex's in April 2000 and Essex began sending the Petersons invoices in May 2000. Goldberg's fraud continued through January 2002 (as the Petersons continued to purchase Stamford based on Goldberg's recommendation). Despite the fact that the Petersons never signed an engagement letter, Essex sometimes provided services clients without engagement letters. (Freedman Dep. at 165; Squires Dep. at 43-48). A reasonable fact-finder could conclude that Essex owed the Petersons a duty of care beginning in April 2000.

G.    Recission

The Defendants argue that the Petersons' claims for recission are untimely, but their arguments are without merit. Under Illinois Law, plaintiffs must provide notice if their intent to seek recision "within six months after the purchaser shall have knowledge that the sale of securities to him or her is voidable." 815 ILCS 5/13(b). Defendants argue that the Petersons had knowledge that Dauphin was a high-risk stock in September 1999, but did not seek recission until filing this claim in October 2002. But again, Defendants ignore the fact that the Petersons claim is not based on the fact that Goldberg sold them high-risk investments, it is based on the fact that he defrauded them. Next, Defendants argue that the Petersons acknowledged that they discovered "Goldberg's concealments" in the first quarter of 2002, more than six months prior to giving notice to Defendants of their intent to seek recission. But the six-month period does not begin to run when the plaintiff has knoweldge of the facts giving rise to his claim. Instead, it begins to run when the plaintiff is aware that these facts actually grant him a right to relief. *See Pucci v. Santi*, 711 F. Supp. 916, 925

(N.D. Ill. 1989); *Ansbro v. Southeast Energy Group, Ltd.*, 658 F. Supp. 566, 572-73 (N.D. Ill. 1987).

Defendants offer no evidence to suggest that the Petersons were actually aware of the law that gave them the right to rescind.

The Defendants make one final argument that the Petersons have waited to long to rescind their purchases. They argue that because the Petersons have already sold the Dauphin stock, that their right to rescind has passed since they must "tender to the seller or into the court" the stocks in order to exercise this right. Defendants' argument is frivolous, and arguably sanctionable. Section 5/13(a)(2) clearly allows a purchaser to rescind "if the purchaser no longer owns the securities, for the amounts set forth in clause (1) of this subsection A less any amounts received by the purchaser for or on account of the disposition of the securities." Defendants' counsels utterly ignore this portion of the statute, which could not possibly be more clear. The Court will, this time, give counsels the benefit of the doubt here and consider counsels' oversight an example of the extraordinarily shoddy and sloppy work that plagues the entire summary judgment motion and not an example of a willful effort to mislead the Court regarding the applicable law.

<u>H.</u>    <u>Punitive Damages</u>

Finally, Defendants argue that the Petersons' claims for punitive damages should be stricken. Punitive damages can be awarded only where the defendant's conduct is "outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." *Loitz v. Remington Arms Co.*, 563 N.E. 2d 397, 402 (Ill. 1990). Defendants argue that "Plaintiffs have not even alleged that FPFS engaged in willful or wanton conduct." The Court disagrees. Among the facts alleged by the Plaintiffs is that the Defendants knew that Goldberg was recommending investments in which he had an interest and yet failed to do anything to supervise

27

him to ensure that he was disclosing his interest. In fact, the Plaintiffs point to facts that show that even after the Defendants knew that Goldberg was continuing his special projects after the date upon which he had agreed to wind them down, they actually *decreased* their supervision. The Plaintiffs also point to two notices from the SEC, each of which suggest the Defendants' supervision of Goldberg was lacking. Even though the question of whether punitive damages are available as a remedy is a question of law, the question of whether punitive damages should be awarded given a particular set of facts is a question of fact. *Kinesoft Dev. Co. v. Softbank Holdings, Inc.*, 139 F. Supp. 2d 869, 913 (2001). A reasonable fact finder could conclude from the facts that the Defendants were recklessly indifferent to the rights of others when they failed and even decreased their supervision of Goldberg despite knowledge that he was engaging in activity which they did not condone and which they had instructed him to cease.

### IV. Conclusion

For the reasons stated herein FPFS' Motion for Summary Judgment is GRANTED in part and DENIED in part as specified herein. The Essex Defendants' Motion for Summary Judgment is likewise GRANTED in part and DENIED in part as specified herein. All claims against Defendants Arthur Freedman and James Hartwell are dismissed.

IT IS SO ORDERED.

_2/25/05_
Dated

The Honorable William J. Hibbler
United States District Court

28